Filed 10/27/15  P. v. Flippin CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBIN ANDRE FLIPPIN,<br><br>     Defendant and Appellant. | A139437<br><br>(Solano County<br>  Super. Ct. No. VCR214418) |

This is an appeal from judgment after a jury convicted defendant Robin Andre Flippin of assault with a firearm (count one) and false imprisonment by violence or menace (count two), enhanced for his personal use of a firearm (both counts) and infliction of great bodily injury (count one).  Defendant challenges this judgment on grounds that include prosecutorial misconduct, ineffective assistance of counsel, belated amendment of the information to allege personal use of a firearm as to count two without adequate notice, and insufficiency of the evidence to prove this enhancement as to count two.  For reasons discussed below, we conclude the trial court prejudicially erred when permitting amendment of the information after the close of evidence to allege personal use of firearm as to count two.  Accordingly, we reverse the finding that defendant personally used a firearm during commission of count two.  In all other regards, however, we affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

On October 4, 2012, an information was filed charging defendant with assault with a firearm (Pen. Code, § 245, subd. (a)(2)) (count one), and false imprisonment by

1

violence or menace (Pen. Code, § 236) (count two).  Several enhancements were also alleged, including that defendant personally used a firearm, to wit, a revolver (Pen. Code, § 12022.5), personally inflicted great bodily injury upon the victim (Pen. Code, § 12022.7, subd. (a)), and had two prior strikes within the meaning of section 667, subdivision (a)(1), and a prior strike within the meaning of sections 1170.12, subdivisions (a)-(d) and 667, subdivisions (b)-(i).

Trial began on May 14, 2013, and revealed the following evidence.

## I.     The Prosecution's Case.

In the late evening of March 11, 2012, the victim was in Walnut Creek with his mother, who had recently been released from the hospital.  At about midnight, the victim received a call from Valerie Brown-Flippin, defendant's wife.[1]  Brown-Flippin owned a house on Miller Street in Vallejo where the victim and his wife had rented a room since September 2011, although they had recently announced their intention to move elsewhere.[2]  Brown-Flippin told the victim his belongings were being thrown out of the house, and that he should return immediately if he wanted to salvage them.  The victim thus drove to the Miller Street house, arriving between 1:00 a.m. and 2:00 a.m.

Upon entering the house, the victim saw defendant, but not Brown-Flippin.  The victim, upset to see his property strewn throughout the house, began making a video recording of the incident with his cell phone.  The victim told defendant that he did not want to speak to him, as his rental agreement was with Brown-Flippin.  Defendant then called Brown-Flippin, who arrived in less than 10 minutes and entered into the living room, where she found the two men.  The victim told Brown-Flippin that it was the middle of the night and she could not evict him, as he had no other place to live.  Brown-

---

[1]     Brown-Flippin and defendant separated in January 2012.

[2]     Brown-Flippin lived in another house in Vallejo that she owned on Grennan Street, but frequently visited her Miller Street house.  Her brother, Kevin Dixon, lived with his girlfriend in the Miller Street house.  Pursuant to an oral contract, the victim agreed to pay Dixon weekly rent of $100, which went to Brown-Flippin, and to help Dixon with various home improvement projects, including a kitchen remodel.

Flippin replied that she could indeed evict him because he had not paid rent. At this point, defendant suddenly hit the victim in the head with a pistol, which the victim believed was a .38 caliber revolver. The victim, losing balance and dropping his phone, fell to the ground, where defendant got on top of him and continued to hit him with the pistol about 10 to 15 times in the face, mouth and elsewhere. During this attack, both Brown-Flippin and the victim repeatedly yelled at defendant to stop.

Finally, defendant did stop, and the victim got up, retrieved his phone and tried to leave through the front door. Defendant, however, snatched the phone and took the victim by the collar, leading him outside the house to the victim's car. Despite Brown-Flippin's calls for his release, defendant shoved the victim into the car through the passenger-side door and commanded him to move to the driver's seat. When the victim tried to put his keys into the ignition, defendant grabbed them. Brown-Flippin asked defendant what he was doing, to which defendant responded that he had to "finish this." The victim believed defendant intended to kill him, and so stayed in the car without attempting to flee.

The victim ultimately remained in the car about 30 minutes, while both he and Brown-Flippin tried to convince defendant to release him. The victim, pleading, repeatedly stated that he would not call the police, as he had been beaten before and could handle it. He also told defendant that he had been wrong and "had it coming," and promised to return the next day to collect his belongings. Finally, defendant freed the victim, who drove to a camper he kept in a nearby storage yard. Once there, he examined his injuries and called his wife, who picked him up and drove him to the hospital.

The victim, bloody and bruised with a missing tooth, required 14 facial stitches at the hospital. Police Officer Sean Kenney photographed his injuries at the hospital. The victim initially declined to volunteer any information about his injuries because he feared retaliation from defendant. However, eventually, the victim named defendant as his attacker, and also provided the name "Victoria Flippin." The victim did not give Officer Kenney an exact address for defendant, and said he had lived for about six months at the Miller Street house, but that he was no longer there because of problems. The victim,

3

who was on probation at the time, told the officer he had been beaten before, and would likely be beaten again, but declined to give further details about his attack.

The next day, the victim and his wife returned to the Miller Street house for his belongings. He did not tell the police of his return, or ask for any assistance.

During testimony, the victim described having a strained relationship with defendant even prior to this incident. About a month after the victim moved into the Miller Street house, defendant pointed a gun at the victim and a friend while they were talking at the sidewalk. According to the victim, during this confrontation defendant mouthed the words, "bang bang," before going around the corner and firing the gun. The victim had no idea what had triggered defendant's behavior. However, about a month later, the victim obtained a restraining order against defendant. This restraining order said nothing about defendant pointing a gun at the victim, or discharging it.

## II.    The Defense Case.

Brown-Flippin's testimony conflicted with the victim's testimony in several regards. She denied having negotiated an agreement or accepted rent from the victim, insisting his agreement was with Dixon, to whom he paid rent. Brown-Flippin added that she was quite unhappy with the state of her Miller Street house and wanted everyone, including Dixon, to move out.

Brown-Flippin also denied calling the victim on the night in question to tell him to come over immediately to salvage his property. She did not witness defendant harming the victim; nor did she witness defendant shove the victim into his car or hear him say he needed to finish what he had started.

Cynthia Browning, a Vallejo attorney, testified that, in March 2012, she was dating defendant, whom she had met online in April 2011 when he responded to a personal advertisement. During this time period, defendant generally stayed with Browning at her house from Sunday to Wednesday. Defendant was at Browning's house the entire night of March 11, 2012, a fact she never told police, but revealed to a defense investigator for the first time shortly before defendant's trial. Browning did not know defendant was married until April 2012, when he reconciled with his wife.

4

Defendant, testifying in his own defense, acknowledged permitting the victim to stay in the Miller Street house temporarily to work on kitchen plumbing problems. However, friction developed between the men over the condition of the house. Neighbors complained that scrap metal had been left in the yard, a carpet had burn marks, and a window had been painted over. The victim moved out in January 2012, although some of his property remained longer.

On the night in question, defendant was at Browning's house. At no point did he contact the victim, pistol-whip him, take his keys or refuse to let him leave.

### III.     The Verdict, Sentencing and Appeal.

On May 22, 2013, the jury found defendant guilty on both counts, and found true the great bodily injury allegation as to count one and the personal use of a firearm allegations as to both counts. After defendant waived the right to a jury trial on the prior strike allegations, the trial court found true one prior strike. The court then sentenced defendant to a total prison term of 15 years. Specifically, with respect to count one, the court imposed the 3-year midterm, plus 5 years for the prior strike, 4 years for the firearm enhancement, and 3 years for the great bodily injury [GBI] enhancement, to be served consecutively. With respect to count two, the court imposed the 2-year midterm, plus 4 years for the firearm enhancement, to run concurrently. The court then stayed this sentence on count two per section 654. The timely appeal followed.

### DISCUSSION

Defendant raises four primary issues on appeal. First, defendant contends the prosecutor committed prejudicial misconduct when arguing to the jury the presumption of innocence had been "stripped away" in this case. Second, defendant contends that, should this court conclude he has forfeited the issue of prosecutorial misconduct, we should deem his attorney's failure to object to the purported misconduct to be constitutionally ineffective assistance of counsel. Third, defendant contends the jury's finding that he personally used a firearm within the meaning of section 12022.5 during the commission of count two (false imprisonment) lacks the support of substantial

evidence. Lastly, and alternatively, defendant contends the trial court committed prejudicial error when granting the prosecution's request to amend the information after the close of evidence. We address these issues in turn below.

## I. Prosecutorial Misconduct.

The governing legal standards are well-established. "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44 (*Morales*). See also *People v. Samayoa* (1997) 15 Cal.4th 795, 841 [federal Constitution violated where prosecutorial misconduct is "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process"].) Under these standards, " ' " 'a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' . . . 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819.) When the alleged prosecutorial misconduct stems from the prosecutor's remarks or comments made before the jury, "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.)

To preserve a claim of prosecutorial misconduct for appeal, the defendant is generally required to make a timely objection at trial, as well as a "request[] that the jury be admonished to disregard the perceived impropriety." (*People v. Thornton* (2007) 41 Cal.4th 391, 454.) However, courts have excused defense counsel's failure to timely object or to request a curative admonition under circumstances where such action by

6

counsel would have been futile.  (*People v. Hill, supra,* 17 Cal.4th at p. 820; see also *People v. Lucas* (1995) 12 Cal.4th 415, 457.)

Where a claim is preserved or failure to object is excused and prosecutorial misconduct is found, the question becomes whether such misconduct was prejudicial, that is, whether it is reasonably probable a result more favorable to the defendant would have occurred if the prosecutor had refrained from the misconduct. (*People v. Haskett* (1982) 30 Cal.3d 841, 866.)  Prosecutorial misconduct requires reversal under federal law unless the misconduct was harmless beyond a reasonable doubt.  (*People v. Cook* (2006) 39 Cal.4th 566, 608.)

Here, defendant acknowledges his failure to object or request an admonition to cure any harm from the purported prosecutorial misconduct.  Defendant asks, however, that we exercise our discretion to address this claim, arguing that the prosecutor misstated the law with respect to the People's burden to prove his guilt beyond a reasonable doubt, and thereby violated his constitutional right to due process.  Defendant's contention is based upon the following comments by the prosecutor during closing arguments, which we set forth below in proper context:

"Last week, as the defendant sat there, he was cloaked with the presumption of innocence, and that's fair.  That's the law.  That's reasonable, but it's our position that with every word of testimony, with every photograph, *that presumption of innocence has been stripped away*, and as the defendant sits there now, he's guilty with everything with which he's been charged, because the only person's testimony that could be corroborated with actual evidence is [the victim's].  [The victim's] photographs and his testimony.

"Now, I get to talk to you twice, and I'm not going to talk to you a long time, because, bottom line, if you believe [the victim] the defendant is guilty with everything he has been charged with, but I want to briefly go over why.  And then after [defense counsel] speaks, I get to talk to you again because the burden of proof is on the People, but I promise both will be short.

"Now, the Judge read you the instruction and you're going to have the instructions with you, but I wanted to explain what the facts have shown."  (Italics added.)

7

Having considered the record, even were we to excuse defendant's admitted forfeiture of this issue, we would nonetheless find no prosecutorial misconduct. While we agree with defendant that the presumption of innocence is a core component of our criminal justice system (*Estelle v. Williams* (1976) 425 U.S. 501, 503), and that "the presumption of innocence continues not only during the taking of the testimony, but during the deliberations of the jury and until they reach a verdict" (*People v. Arlington* (1900) 131 Cal. 231, 235), we disagree that these principles were undermined in this case. " ' "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Ward* (2005) 36 Cal.4th 186, 215.)

Here, the prosecutor's argument that the "presumption of innocence has been stripped away" was made in the course of his broader argument that "[the People's] position" is that the evidence, considered as a whole, established defendant's guilt beyond a reasonable doubt. In so arguing, however, the prosecutor reminded the jury that the trial court would read the instructions, which the jury must follow, before emphasizing that his plan was to "explain what the facts have shown." As the California Supreme Court has repeatedly made clear: "[The prosecutor] has the right to fully state his views as to what the evidence shows and to urge whatever conclusions he deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283; *People v. Panah* (2005) 35 Cal.4th 395, 463 [finding nothing improper in the prosecutor's statement in closing arguments that the prosecution's evidence had "stripped away" the defendant's presumption of innocence]. Cf. *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1407-1408 [noting that, while the prosecutor's initial comment that the "presumption of innocence is over," prefaced by a reference to the overwhelming evidence of guilt, was arguably permissible under *Panah*, the prosecutor subsequently committed misconduct when "[he] repeated

8

the misstatement, together with the assertions that it was 'fairly obvious' [defendant] was guilty, and most critically, '*He has gotten his fair trial*' "].)[3]

Finally, in reaching this conclusion, we point out that the trial court clearly instructed the jury that defendant, like all criminal defendants, must be presumed innocent unless or until the prosecution proves him guilty beyond a reasonable doubt, and that nothing the attorneys say is evidence. We, of course, presume the jury followed these instructions. (*People v. Delgado* (1993) 5 Cal.4th 312, 331; accord *People v. Goldberg* (1984) 161 Cal.App.3d 170, 189-190 ["Once an otherwise properly instructed jury is told that the presumption of innocence obtains until guilt is proven, it is obvious that the jury cannot find the defendant guilty until and unless *they*, as the fact-finding body, conclude guilt was proven beyond a reasonable doubt"].) As such, even assuming for the sake of argument the prosecutor's remark could be deemed improper, on this record, and in the absence of any other allegedly improper remark or conduct by the prosecutor, there is no reasonable likelihood "the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*Morales, supra,* 25 Cal.4th at p. 44.) Defendant's challenge thus fails.

## II. Ineffective Assistance from Counsel.

Next, our rejection of defendant's claim of prosecutorial misconduct also undermines his second contention – to wit, that his attorney rendered ineffective assistance by failing to object to the prosecutor's remark that the presumption of evidence had been "stripped away."

To prevail on a claim of ineffective assistance of counsel, the defendant must prove more than a failure by counsel to raise a particular objection or undertake a particular strategy; rather, "defendant must show counsel's performance fell below a

---

[3] In *People v. Dowdell*, defendant's authority, the reviewing court ultimately found the defendant's claim of prosecutorial misconduct had been forfeited given his failure to raise a timely objection to the challenged statements in the trial court. (227 Cal.App.4th at p. 1408.) Likewise, in this case, as stated above, even if we could deem the prosecutor's comment improper (we do not), defendant has forfeited any claim of prejudicial error.

9

standard of reasonable competence, and that prejudice resulted." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) Here, given our conclusion that no prosecutorial misconduct occurred, there is no valid basis for accepting defendant's related claim that his attorney's failure to raise a prosecutorial misconduct objection amounted to "prejudicially ineffective representation." (See *People v. Burnett* (1999) 71 Cal.App.4th 151, 180 [to prevail on a claim of ineffective assistance from counsel, defendant must overcome a strong presumption that counsel's conduct was sound trial strategy or otherwise within the wide range of reasonable professional assistance].)

## III.    Untimely Amendment of the Information.

Defendant next argues the trial court prejudicially erred by permitting an amendment to the information after close of evidence to allege his personal use of a firearm during the false imprisonment offense within the meaning of section 12022.5, subdivision (a) (hereinafter referred to as "section 12022.5(a)").[4] The relevant record is as follows.

The information, as filed on October 4, 2012, set forth count one, assault with a firearm, followed by the further allegation that defendant personally used a firearm (to wit, a revolver) within the meaning of section 12022.5(a), among other special allegations. Below count one, the information set forth under a separate heading count two, false imprisonment by violence or menace, without restating the special allegation under section 12022.5(a) that defendant personally used a firearm. There was mentioned after count two, however, a different allegation that defendant was not eligible to be sentenced to a term of imprisonment in county jail due to a prior or current felony conviction for a serious or violent felony. (See §§ 1170, subds. (h)(3), (f); § 1385; § 1192.7; § 667.5).

---

[4]    Section 12022.5(a) provides: "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense."

At trial, the victim testified with respect to count one that defendant attacked him in the living room, hitting him repeatedly in the head and face with revolver, while he attempted to cover his head to protect himself. The victim then testified that, after defendant stopped this attack, he tried to flee outside, but defendant grabbed him by the collar to prevent him from leaving. At this point, defendant "more or less escorted [the victim]" to his car, opened the door, and "threw [him] in." The victim made no further mention of defendant's possession – much less display or use – of the gun other than to explain that he did not try to flee because he "knew [defendant] had a gun."

On May 21, 2013, after the close of evidence and during the settling of the jury instructions, the trial court asked the prosecutor whether it was the People's intent to allege the personal use enhancement as to both counts, or only as to count one. The prosecutor responded both counts. Defense counsel, in turn, objected, noting that the personal use enhancement was only mentioned in the information after count one was set forth, and was not repeated after count two, which was set forth in another section, such that he was not on notice that personal use of a firearm was being alleged as to count two. Instead, count two, false imprisonment, was alleged to have been committed by "violence or menace," not by firearm use.

The trial court disagreed, finding that defendant's alleged personal use of a firearm was a "continuous act" in the course of his commission of both offenses, such that it was proper to instruct the jury on the allegation in connection with both counts. In reaching this conclusion, the trial court noted that, in the information, the firearm allegation was "not limited in the way it's charged" to count one. As such, the trial court found, "in terms of notice, there's sufficient notice."

However, as the trial court subsequently instructed the jury, the personal use enhancement requires more than a finding that the false imprisonment occurred by violence or menace:

"If you find the defendant guilty of the crimes charged in Counts One or Two, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant personally used a firearm during the commission of that

11

crime. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] . . . [¶]

" Someone personally uses a firearm if he or she intentionally does any of the following:

1.       Displays the weapon in a menacing manner;

2.       Hits someone with the weapon; [¶] OR [¶]

3.       Fires the weapon. . . ."

Yet, despite these legal requirements, the prosecutor, during trial, neither elicited from the victim or defendant that defendant displayed, hit the victim with or fired the weapon once the men left the house for the car, nor mentioned any such firearm use by defendant when arguing to the jury with respect to the evidence supporting count two. Rather, the prosecutor argued that defendant "made [the victim] stay in the car against his will," and "[t]hat's by violence. That's by menace."[5] This contrasts sharply with the prosecutor's argument with respect to count one, where he specifically applied the evidence to the law under section 12022.5(a): "[L]ast, you determine whether or not defendant had the firearm and he used it. And he did; he hit [the victim] with the firearm. [The victim] was able to describe the weapon."

During deliberations, the jury sent a question to the trial court relating to the personal use enhancement, which stated: "Please clarify the combination of 'Assault' and 'with a firearm' in Count 1. Since Count 1 includes 'with a firearm,' how can we conclude 'guilty' for Count 1, but 'not guilty' for the secondary question? (i.e. 'personally used a firearm')." The trial court, after discussing the matter with counsel, responded in relevant part: "The allegation of Personal Use of a Firearm During the Commission of a Crime in violation of Penal Code Section 12022.5 is a separate and distinct allegation from Count One. You must independently determine whether all of the elements of the allegation . . . . have been met as set forth in jury instruction no.

---

[5]      The prosecutor specifically argued: "[The victim] didn't put up with a fight. [The victim] knew he had just been pistol whipped by the defendant. He heard the defendant tell his wife, I've got to finish what I started. That's by violence. That's by menace."

3146." The jury thereafter concluded its deliberations and returned a verdict of guilty on all counts, finding true all enhancements.

On appeal, defendant contends the trial court's decision to permit the belated amendment of the information to allege personal use of a firearm as to count two was prejudicial error for two reasons. First, defendant contends he lacked adequate notice of the allegation, such that he was unable to cross-examine the victim regarding defendant's use or nonuse of the firearm during commission of the false imprisonment offense. Second, defendant adds that, because the prosecutor also failed to question him about the presence of the gun during count two, his personal use of the firearm within the meaning of section 12022.5 was never established. We agree.

"Due process requires that 'an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' (*People v. Jones* (1990) 51 Cal.3d 294, 317 [270 Cal.Rptr. 611, 792 P.2d 643].) Thus, it is the rule that 'a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising out of the transaction upon which the commitment was based.' (*People v. Burnett* (1999) 71 Cal.App.4th 151, 165-166 [83 Cal.Rptr.2d 629] (*Burnett*); see Cal. Const., art. I, s 14 ['Felonies shall be prosecuted as provided by law, either by indictment or, after examination and commitment by a magistrate, by information'].)" (*People v. Graff* (2009) 170 Cal.App.4th 345, 360.)

Consistent with this rule, "[t]he court may allow amendment of the accusatory pleading to correct or make more specific the factual allegations of the offense charged at any stage of the proceeding, up to and including the close of trial, if there would be no prejudice to the defendant." (*People v. Graff, supra*, 170 Cal.App.4th at p. 361, citing section 1009.) "Under the case law interpreting section 1009, the test applied is whether or not the amendment changes the offense charged to one not shown by the evidence taken at the preliminary examination." (*People v. Spencer* (1972) 22 Cal.App.3d.786, 799.)

13

According to defendant, in this case, "[t]he court's ruling [to amend the information and give the personal use instruction on count two] left defense counsel unable to establish through cross-examination that appellant may not have still had the gun, so the assumption led to a true finding without the prosecution having to prove that [he] did have the gun and used it while [the victim] was in the car." In light of the legal principles set forth above, we agree with defendant the trial court's ruling amounted to prejudicial error. (See *People v. George* (1980) 109 Cal.App.3d 814, 819 [ruling to amend the information reviewed for abuse of discretion].) Indeed, the "essential purpose of an information is to inform the accused of the charge he is required to meet at the trial so that he may prepare his defense." (*People v. Spencer, supra,* 22 Cal.App.3d at p. 800.) Here, defendant was not so informed. Rather, the information, reasonably read, limited the personal use of a firearm allegation to count one. Moreover, at no time during the presentation of evidence or attorney summation did the prosecution make clear to defendant (or even suggest to him) that its theory was that he personally used a firearm when falsely imprisoning the victim. To the contrary, the prosecution failed to make any mention of defendant's possession or use of a firearm once the men left the house, where and when defendant forced the victim into his car and imprisoned him for at least a half hour, aside from mentioning the victim's lingering fear of the gun in light of the earlier assault.[6] As such, defense counsel had no reason to pin down the fact of defendant's *nonuse* or *nondisplay* of the firearm during this time period.

Moreover, in contrast to trial, the victim twice testified at the preliminary hearing that he *did not recall* seeing defendant with the firearm after they left the living room (where the assault was committed) and went outside to the victim's car (where the false imprisonment was committed). The victim also testified during the preliminary hearing

---

[6] By comparison, when arguing with respect to count one, the prosecutor expressly stated: "The personal use of a firearm – there was nobody else but the defendant there. There was no one else with the firearm, except the defendant. [¶] So first you look at the elements of assault with a firearm. Then you determine whether or not those injuries are great bodily injuries, and, last, you determine whether or not the defendant had the firearm and he used it. And he did; he hit [the victim] with the firearm."

14

that defendant did not show him the gun while he remained in the car, even though he "believed" defendant had the gun. Under California law, "a preliminary hearing transcript affording notice of the time, place and circumstances of charged offenses 'is the touchstone of due process notice to a defendant.' [Citation.]" (*People v. Pitts* (1990) 223 Cal.App.3d 606, 908; see also *People v. Burnett, supra*, 71 Cal.App.4th at pp. 165-166.) In this case, as the record reflects, the preliminary hearing transcript provided no such notice to defendant, with the result that the amendment to the information caused him prejudice. (Cf. *People v. Witt* (1975) 53 Cal.App.3d 154, 166 [concluding defendants were not prejudiced by late amendment of the information where "there were no new legal issues created by the amendment, and there was in reality no dispute whatsoever that [defendants] had testified in accordance with the new allegations"], overruled in part on another ground in *People v. Posey* (2004) 32 Cal.4th 193, 205 fn. 5.)

In so concluding, we acknowledge the People's argument that, "Nothing in the language of section 12022.5(a) discloses a legislative intent to limit its application to situations where the gun is pointed at the victim or the defendant issues explicit threats of harm." (*People v. Granado* (1996) 49 Cal.App.4th 317, 322.) However, in our case, neither the victim nor defendant testified that defendant still had the gun after leaving the house.[7] Moreover, the victim testified that, once outside, defendant grabbed both his cell phone and his keys, suggesting that defendant's hands may have been free at that time. Thus, it is perhaps true, as the People argue, that, "when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any

---

[7]     The court in *People v. Granado* went on to explain: " ' "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." (Webster's New Internat. Dict. (3d ed. 1961).) The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' (*People v. Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024] (*Chambers*).) In other words, the term 'use,' as employed in this statute, should be broadly construed, consistent with common usage, to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor." (*People v. Granado, supra,* 49 Cal.App.4th at p. 322 [fn. omitted].)

purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." (*Granado, supra,* 49 Cal.App.4th at p. 325.) However, this same authority makes equally clear that *"[t]he defense may freely urge the jury not to draw such an inference*, [even though] a failure to actually point the gun, or to issue explicit threats of harm, does not entitle the defendant to a judicial exemption from section 12022.5(a)." (*Ibid.*[ italics added.]) Here, we conclude defendant was deprived of this opportunity. Accordingly, we stand by our conclusion that the trial court abused its discretion by permitting the information to be amended to add the allegation that defendant personally used a firearm within the meaning of section 12022.5(a) during the commission of false imprisonment.

Finally, given our conclusion that amendment of the information was prejudicial error in this case, we need not address defendant's alternative argument that the evidence was insufficient to support his personal use of a firearm during commission of count two.

## DISPOSITION

The finding that defendant personally used a firearm during commission of count two is reversed and stricken from the judgment. In all other regards, the judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
Pollak, Acting P. J.

_____
Siggins, J.

16